Filed 2/7/19; pub. & mod. order 3/1/19 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>ANDRE SMITH,<br><br>  Defendant and Appellant. | A141594<br><br><br>(Alameda County<br>Super. Ct. No. C172416B) |
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>JABRIE BENNETT,<br><br>  Defendant and Appellant. | A142094<br><br><br>(Alameda County<br>Super. Ct. No. C172416A) |

This criminal prosecution is the result of multiple charges brought against two co-defendants—Jabrie Bennett and Andre Smith[1] (collectively, appellants)—in connection with a January 2013 altercation between two groups of teenagers outside of the Bayfair BART station in San Leandro, which escalated to the point where shots were fired and Kenneth Seets, an innocent bystander, was killed. Bennett was additionally prosecuted for the attempted murder of Donnell Jordan, based on an unrelated incident that occurred

---

[1] After their introduction, we generally refer to the individuals involved in these proceedings by their last names. However, individuals with the last name Smith—other than co-defendant Smith—will be referred to by their first names for purposes of clarity.

1

two days prior to the BART shooting and involved the same gun. Both Bennett and Smith raise numerous claims of error on appeal. Together, they assert that the prosecutor improperly used three of his peremptory challenges to excuse potential jurors because they were Black, in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162, 165. Bennett separately claims that the trial court committed two instructional errors and made two improper evidentiary rulings, all of which were prejudicial. He additionally maintains that, even if his convictions are otherwise affirmed, his matter should nevertheless be remanded for possible resentencing due to an intervening change in the law related to firearm enhancements. For his part, Smith separately challenges the denial of his new trial motion on several different grounds. We affirm the convictions of both Bennett and Smith. However, we agree with Bennett that the trial court should reconsider his sentence in light of recent amendments to Penal Code section 12022.53,[2] and therefore remand Bennett's case for possible resentencing.

## I. BACKGROUND

### A. *The BART Shooting of Kenneth Seets*

On January 19, 2013, two sets of teenagers found themselves at an AC Transit bus station immediately adjacent to the Bayfair BART terminal in San Leandro. In addition to himself, Bennett's group included his girlfriend, Antilea Beal, Beal's cousin, Ylea Means, and Means' boyfriend, Roland Smith. The members of this group had just come from the Bayfair Mall and were talking and smoking marijuana. A second group arrived comprised of Smith, his brother Askari Smith, and an acquaintance, Ryan Purry. Askari stated that Smith and Purry had initially appeared to be having a disagreement, but then they shook hands and all three smoked marijuana together. Since the two groups were standing near a bus, multiple video cameras on that bus recorded the subsequent altercation between them.

---

[2] All statutory references are to the Penal Code unless otherwise specified.

Specifically, a verbal exchange started when someone in Smith's group (apparently Askari) asked Roland if he knew them and why he was staring at them. Askari testified that Roland was "mugging," that is, looking hostilely at them. During some back and forth, largely between Beal and Askari, Beal reportedly made the statement: "Got something bigger than y'all poor [or little] ass niggas." Askari took this to mean that she had a gun. A bystander testified that someone from Smith's group said something like: "You won't be able to do anything when there is a gun pointed at you." And Bennett told Smith's group to stop talking to his girl like that.

Shortly thereafter, Smith appeared to grip something near his waist and walk towards Bennett's group. Smith later admitted to the police that he was clenching a gun tucked into his waistband. He claimed he just wanted the other group to shut up and leave them alone. According to Roland, however, as Smith advanced, he said: "I'll spark this" or "I'll clear it out." Roland believed this meant Smith would start shooting. Although there were obvious credibility issues given the circumstances—and no firearm could later be seen by a forensic analyst on relevant video—Roland, Beal, and Bennett all testified that they saw Smith with a gun. Bennett then pulled out a semiautomatic firearm he had been carrying in a duffle bag and started shooting in Smith's direction while backing up. He fired two or three shots and then hit a pole and fell down. After he got back up, he continued to fire, emptying his clip. Askari testified that after Bennett fell, he heard more shots and saw Smith on the ground. Askari then pulled out his own handgun and fired approximately five shots. Seets, a 50-year-old man who had been waiting for the bus, was fatally shot by a bullet which was later determined to be consistent with having been fired by Bennett's weapon.

## B.      The Attempted Murder of Donell Jordan

On January 17, 2013, two days before the BART shooting described above, Donell Jordan—a 17-year old high school student—was discovered lying in the street near 89th and Hillside in Oakland with a gunshot wound to his lower back. Jordan told the police officer who responded to the scene that he had been shot by someone he had seen before, a black male who wore dreadlocks. Thereafter, Jordan repeatedly refused to

identify his assailant. However, his cousin, Nicole Walton, told the police that Jordan had identified Bennett as the shooter when she visited him in the hospital shortly after the incident. In addition, Jordan reportedly pulled up a picture of Bennett on Facebook and Walton took pictures of the Facebook page, which she later transmitted to the police. These pictures were introduced at trial. After Walton identified Bennett to the police, investigators compared the cartridge casings from the BART shooting and the Jordan shooting. The 11 casings recovered from the Jordan shooting and the 9 casings recovered from the BART shooting all came from the same gun, the Sig Sauer .22 semi-automatic rifle that the police had located in a bush after the BART shooting.

At trial, Jordan admitted that he knew Bennett from the neighborhood; that he had been to Bennett's house; and that the two had smoked marijuana together on several occasions. Bennett lived about two blocks from where Jordan was shot. Jordan further testified that, during the two months before he was shot, his relationship with Bennett deteriorated and, on the day of the shooting, he and Bennett exchanged words while Jordan was on his way to school. Bennett hit Jordan, and then Jordan hit Bennett several times, causing him to stumble. Jordan remembered seeing a long black gun, but could not say who was holding it. He ran away, hearing 9 or 10 shots fired before he was ultimately shot in the back as he moved out from behind a car where he had taken cover. Jordan denied ever telling Walton that Bennett was the shooter.

## C.    *Procedural History*

As a result of these incidents, an information was filed by the Alameda County District Attorney on September 20, 2013, charging Bennett and Smith with the murder of Seets (§ 187, subd. (a)). The information further alleged with respect to this murder charge that both Smith and Bennett personally used a firearm during the commission of the crime (§§ 12022.5, subd. (a), 12022.53, subds. (b) & (g)) and that Bennett personally and intentionally discharged a firearm and personally inflicted great bodily injury (§§ 12022.53, subds. (c) & (d), 12022.7, subd. (a)). Bennett was also charged with the attempted premeditated murder of Jordan (§§ 187, subd. (a), 664, subd. (a)), with attendant great bodily injury, use of a firearm, and discharge of a firearm allegations (§§

4

12022.5, subd. (a), 12022.53, subds. (b)–(d) & (g), 12022.7, subd. (a)). Finally, Bennett was charged with assault with a semiautomatic firearm in connection with the Jordan shooting, again with great bodily injury and firearm use allegations (§§ 245, subd. (b), 1203.06, subd. (a)(1), 12022.5, subd. (a) & 12022.7, subd. (a)). Smith, in addition to the Seets's murder, was charged with possession of a firearm by a felon (§ 29800, subd. (a)(1)).[3]

At trial, the prosecutor argued that Bennett was guilty of the murder of Seets under a theory of transferred intent, as Seets was killed accidentally while Bennett was attempting to kill Smith. He maintained, however, that Smith was a concurrent cause of Seets's death and was therefore also guilty of murder under a "provocative act" theory. Specifically, the prosecution argued that, by putting his hand on the gun in his waistband and walking forward aggressively toward Bennett's group, Smith committed a provocative act sufficient to make him culpable for Seets's murder based on Bennett's foreseeable reaction. Bennett argued that he was not guilty of Seets's murder because he fired his weapon in either complete or imperfect self-defense, fearing Smith was going to shoot. Smith claimed that his behavior was insufficient to support a murder charge. As for the charges related to Jordan, Bennett asserted that he was not the shooter, having purchased the gun used at the BART station on the day in between that shooting and the shooting of Jordan.

On March 13, 2014, the jury found Bennett guilty of the second degree murder of Seets, the first degree attempted murder of Jordan, and assault with a semiautomatic firearm with respect to the Jordan incident. It additionally found all corresponding enhancements and special allegations with respect to these crimes to be true. Smith, in contrast, was acquitted on the murder charge, but found guilty of unlawful possession of a firearm.

---

[3] Since Smith was a juvenile when he committed the underlying offense for this charge, the information was later amended to reflect a violation of section 29820, subdivision (b): possession of a firearm by a person who committed an enumerated offense which resulted in a juvenile court wardship.

Thereafter, on April 11, 2014, the trial court sentenced Bennett to a prison term of 15 years to life on the murder count and a consecutive prison term of seven years to life on the attempt murder count. In addition, consecutive enhancements of 25 years to life were imposed on each of these counts, as then mandated by section 12022.53, subdivision (d). The assault count and all other enhancements were stayed. Thus, in total, Bennett received a sentence of 72 years to life. With respect to Smith's gun possession charge, in contrast, the trial court imposed and suspended execution of the aggravated term of three years, and admitted him to probation for a five-year period. Appellants' timely notices of appeal now bring the matter before this court.

## II.  CLAIM OF *BATSON/WHEELER* ERROR

Bennett and Smith, who are Black, argue that they were deprived of their constitutional rights to equal protection and a representative jury because the prosecutor exercised peremptory challenges in this case to exclude certain Black prospective jurors.[4] (See *Batson*, *supra*, 476 U.S. 79; *Wheeler*, *supra*, 22 Cal.3d 258.) The law in this area is well settled. " '[A] party may exercise a peremptory challenge for any permissible reason or no reason at all' [citation] but 'exercising peremptory challenges solely on the basis of race offends the Fourteenth Amendment's guaranty of the equal protection of the laws' [citations]. Such conduct also 'violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution.' " (*People v. Smith* (2018) 4 Cal.5th 1134, 1146 (*Smith*).) " 'The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." ' " (*People v. Hardy* (2018) 5 Cal.5th 56, 76 (*Hardy*), quoting *Foster v. Chatman* (2016) 578 U.S.___, ___ [136 S.Ct. 1737, 1747], quoting *Snyder v. Louisiana* (2008) 552 U.S. 472, 478.)

When a defendant alleges discriminatory use of peremptory challenges, a three-step procedure applies. " 'First, the trial court must determine whether the defendant has

---

[4] This claim of error was initially raised by Bennett on appeal, but Smith has since joined in Bennett's arguments as permitted by rule 8.200(a)(5).

made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " (*People v. Jones* (2011) 51 Cal.4th 346, 360 (*Jones*); see also *Smith*, *supra*, 4 Cal.5th at p. 1147.)

If, under the second stage of a *Batson/Wheeler* analysis, a prosecutor is asked to justify his or her conduct in exercising peremptory challenges, that prosecutor must provide a ' " 'clear and reasonably specific' " ' explanation of his or her ' " 'legitimate reasons' " ' for exercising the challenges. (*Jones*, *supra*, 51 Cal.4th at p. 360.) " 'The prosecutor's justification does not have to support a challenge for cause, and even a trivial reason, if genuine and race neutral, is sufficient. The inquiry is focused on whether the proffered neutral reasons are subjectively *genuine*, not on how objectively reasonable they are. The reasons need only be sincere and nondiscriminatory.' " (*Hardy*, *supra*, 5 Cal.5th at p. 76.)

Thereafter, under the third stage of a *Batson/Wheeler* inquiry, the " ' "critical question" ' " facing the trial court " ' "is the persuasiveness of the prosecutor's justification for his peremptory strike." ' " (*Smith*, *supra*, 4 Cal.5th at p. 1147, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–339.) Generally, resolution of this issue " 'comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation and footnote omitted.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).)

In addition, at the third stage of a *Batson/Wheeler* review, " 'a defendant may engage in "comparative juror analysis"; that is, [the defendant] may compare the responses of the challenged jurors with those of similar unchallenged jurors who were not members of the challenged jurors' racial group.' " (*Hardy*, *supra*, 5 Cal.5th at p. 77.) The individuals compared for purposes of such an analysis " 'need not be identical in every respect aside from ethnicity[,] . . . [b]ut they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge.' " (*Ibid.*) This form of circumstantial evidence " 'is relevant, but not necessarily dispositive, on the issue of intentional discrimination.' " (*Smith*, *supra*, 4 Cal.5th at pp. 1147–1148.)

"[C]omparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard." (*Lenix*, *supra*, 44 Cal.4th at p. 624.) However, we must consider such evidence, even if raised for the first time on appeal, whenever it is relied upon by the defendant and the record is adequate to permit the urged comparisons. (*Smith*, *supra*, 4 Cal.5th at p. 1148.) Nevertheless, our review under such circumstances is " 'necessarily circumscribed.' " (*Ibid.*) For instance, a reviewing court "need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment." (*Lenix*, *supra*, 44 Cal.4th at p. 624.)

Finally, as a general matter, our review of a trial court's denial of a *Batson/Wheeler* motion is deferential, "examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' " (*Lenix*, *supra*, 44 Cal.4th at pp. 613–614; see also *Smith*, *supra*, 4 Cal.5th at pp. 1147–1148 [since " ' " 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province" ' " ' . . . in reviewing a trial court's reasoned determination that a

8

prosecutor's reasons for striking a juror are sincere, we typically defer to the trial court' "].)  Moreover, where, as here, " 'comparative juror arguments are made for the first time on appeal, . . . the prosecutor was not asked to explain, and therefore generally did not explain, the reasons for not challenging other jurors.  In that situation, the reviewing court must keep in mind that exploring the question at trial might have shown that the jurors were not really comparable.  Accordingly, we consider such evidence in light of the deference due to the trial court's ultimate finding of no discriminatory purpose.' " (*Hardy*, *supra*, 5 Cal.5th at p. 77.)

Of course, restraint in this context does not mean abdication.  (*Hardy*, *supra*, 5 Cal.5th at p. 76.)  " ' "Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made *a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror.*" ' " (*Ibid.*, italics added.)  Moreover, while " '[s]ome neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication[,] . . . when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in good faith becomes more pressing.' " (*Id.* at p. 77.)  And, " '[t]hat is particularly so when . . . an advocate uses a considerable number of challenges to exclude a large proportion of members of a cognizable group.' " (*Ibid.*)

With this established framework in mind, we turn to the specifics of the trial court's *Batson/Wheeler* analysis in this case.

## A.      *Trial Court Process and General Conclusions*

During jury selection in these proceedings, defense counsel objected on *Batson/Wheeler* grounds after each of the prosecutor's four peremptory challenges to Black jurors.  At the close of the voir dire, the trial court considered all four of the

9

defense's *Batson/Wheeler* motions at length, ultimately denying them all. Appellants here challenge the trial court's determination as to three of these four prospective jurors.[5]

In ruling on the motions before it, the trial court made certain findings applicable to all of the jurors in question. Preliminarily, it found that appellants had made out a prima facie case that the prosecutor had improperly exercised peremptory challenges based on race. Next, the trial judge detailed his own experiences as a lawyer and bench officer in the community, describing a career in Alameda County which included being a superior court judge for almost five years; a municipal court judge for over 27 years; and, before that, a lawyer with a criminal practice. Finally, with respect to numbers, one Black prospective juror was successfully challenged for cause by the defense, four Black jurors were peremptorily challenged by the prosecutor, one Black juror (Juror No. 2) was seated on the jury, and another Black juror was seated as an alternate. The trial court noted that the prosecutor had ample opportunity to challenge both Juror No. 2 and the Black alternate juror and declined to do so, a factor he found "powerful evidence" supporting the credibility of the prosecutor's proffered reasons for excusing jurors.

Before we turn to the individual circumstances of the three challenged prospective jurors here at issue, we note that the Attorney General, characterizing the trial court's detailed *Batson/Wheeler* analysis as "highly assiduous and serious," argues that the court's findings of no discriminatory intent are entitled to deference. Our own review of the extensive record leads us to a similar conclusion. Indeed, we would add to the Attorney General's observations that the trial court's consideration of these difficult questions was both astute and meticulous. Certainly, it constituted a "sincere and

---

[5] The fourth juror challenged below, Doris P., had a son who was serving a prison sentence after a conviction for voluntary manslaughter. Doris P. thought the verdict was "a little harsh" and stated that the fairness of the criminal justice system is sometimes questionable. The prosecutor defended his use of a peremptory challenge in this context, stating: "I can't imagine a DA in this county that would leave a mother of a son convicted of manslaughter, doing time in prison, on their jury." The trial court, citing numerous cases, agreed that it is "entirely reasonable" and race-neutral to excuse a juror whose close relative has had a serious and negative experience with the criminal justice system. Appellants do not question this conclusion.

10

reasoned attempt" to evaluate the prosecutor's decisionmaking in this case, and is therefore entitled to deferential review on appeal.[6]

## B.    *Prospective Juror Pierre M.*

On his jury questionnaire, Pierre M., a 30-year-old Black man, indicated that he believed the justice system was inherently flawed because the laws were manmade. When asked to explain his reasoning for challenging Pierre M., the prosecutor cited this belief. In addition, he pointed to a colloquy he had with Pierre M. during voir dire in which the prospective juror questioned the one witness rule. As the prosecutor elaborated: "[D]espite [Bennett's trial counsel] saying that there is physical evidence connecting the two crimes in this case, the BART shooting and the shooting at 89th and Hillside, the bottom line is that the case, the shooting on Hillside may well depend on evaluations of credibility. Certainly, the same gun was used, but in terms of the

---

[6] In reaching this conclusion, we reject appellants' suggestion that de novo review is appropriate on this record because the trial court applied an improper legal standard in denying their *Batson/Wheeler* claims. Specifically, appellants argue that the trial court incorrectly relied on the fact that the prosecutor left one Black juror on the jury to find no evidence of racial discrimination in this case. It is true that the fact that the prosecutor "passed" or accepted a jury containing a Black juror is not the end of our inquiry. (*People v. Snow* (1987) 44 Cal.3d 216, 225 (*Snow*).) Such a rule "would provide an easy means of justifying a pattern of unlawful discrimination which stops only slightly short of total exclusion." (*Ibid.*) However, our high court has repeatedly held that "[w]hile the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider." (*People v. Turner* (1994) 8 Cal.4th 137, 168; see also *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1170–1171; *People v. Blacksher* (2011) 52 Cal.4th 769, 802; *Lenix*, *supra*, 44 Cal.4th at p. 629; *People v. Cornwell* (2005) 37 Cal.4th 50, 70, disapproved on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *Snow*, at p. 225.) That is exactly what the trial court did here. Among many other factors, it concluded that the retention of one Black juror and one Black alternate supported a finding that the prosecutor's race-neutral reasons for his peremptory challenges were credible. We see no legal error. However, even were we to conclude that the trial court improperly inflated the importance of this factor by finding it "powerful evidence" of the prosecutor's lack of discriminatory intent—and even were we to assume that this amounted to legal error sufficient to vitiate our otherwise deferential review of the trial court's *Batson/Wheeler* conclusions—we would reach the same result under a de novo standard of review.

11

arguments that [defense counsel] is going to be making, he is going to suggest that either or both [Walton] and [Jordan] are lying about Mr. Bennett being the shooter, and that they should be disbelieved. And to break that down just a little bit more, specifically that [Jordan] was not telling the truth when he told his cousin that he was shot by the defendant. [¶] I can't have somebody on the jury—or certainly don't want somebody on the jury who has questions to a law with respect to whether one is sufficient for the proof of any fact."

The trial court found both of the grounds articulated by the prosecutor to be valid and race-neutral reasons for excusing Pierre M. In addition, based on its "own independent recollection of the voir dire process," the trial court found credible the prosecutor's assertion that he had "excused all jurors who he felt there were some either inequalities in our criminal justice system or he had reservations about the effectiveness of the criminal justice system." In a similar vein, the trial court opined that, based on its observations, the prosecutor "also excused all jurors, regardless of race, who expressed a reluctance to apply the one witness rule."

As the trial court properly recognized, both the inability to follow the law and a belief that the criminal justice system is flawed are valid, race-neutral reasons for exercising a peremptory challenge. (See *People v. Elliott* (2012) 53 Cal.4th 535, 569–570 [prospective juror's criticisms of the judicial system are permissible and race-neutral reason for peremptory challenge]; *People v. Clark* (2011) 52 Cal.4th 856, 907 ["A prospective juror's distrust of the criminal justice system is a race-neutral basis for his excusal."]; *People v. Howard* (2008) 42 Cal.4th 1000, 1017 [prospective juror's reluctance to follow the law valid basis for peremptory challenge].) Appellants nevertheless argue that the prosecutor's proffered reasons are not supported by the record and that similarly situated non-Black jurors were not excused. We disagree.

With respect to the one witness rule, Pierre M. did initially tell the trial court generally that he had no problem with following the law as stated by the court. However, during another juror's voir dire, Pierre M. interjected, asking about the definition of "scientific evidence." The prosecutor stated that scientific evidence could include things

12

such as fingerprints or DNA. In response, Pierre M. stated: "Given the case where you have, you have one person and you have maybe two witnesses that said 'I saw this person do that,' *I think I would definitely have challenges with convicting a person based on one or two witnesses because those two witnesses could be in collaboration or anything.* So I mean without any scientific evidence, I don't know what you categorize as scientific evidence, but without any solid evidence, it's not going to, you know, *I can't convict someone based on he said/she said.*" (Italics added.) Even after the prosecutor explained the one witness rule, Pierre M. maintained: "If the law was that one witness said that they saw someone do something, commit a crime, would that be sufficient evidence? *I'd have a lot of trouble with that.*" (Italics added.) The prosecutor then pointed out that at trial Pierre M. might find one witness compelling, or might not, and asked if that helped Pierre M. "to some extent?" Pierre M. replied "Yes." Appellants argue that, by the end of this colloquy with the prosecutor, Pierre M. had accepted the one witness rule. This is by no means clear, however, and—given the magnitude of his difficulty with the concept—we accept the trial court's conclusion that the prosecutor provided a credible, race-neutral reason for challenging Pierre M.

As for Pierre M.'s statement that the justice system is inherently flawed because the laws are manmade, appellants claim that this was a religious-based assertion and that Pierre M. had otherwise reported that he held no religious beliefs that would interfere with his ability to serve as a juror. It was not unreasonable, however, for the prosecutor to credit Pierre M.'s specific statement over his more general one. Certainly, there is nothing in this record of sufficient concern to support rejection of the trial court's reasoned finding that the prosecutor's stated justification was genuine. In this regard, we reject appellants' claim of pretext based on the prosecutor's apparent failure to challenge four non-Black jurors with similar views. Preliminarily, we agree with the Attorney General that none of the views expressed by these other jurors appear as problematic as

13

the concern articulated by Pierre M.[7]  More fundamentally, however, appellants do not establish that any of these jurors also had significant problems with the one witness rule (or any other similarly serious disqualifying issue), and thus their attempt at comparative juror analysis fails at the outset.  (See *Hardy*, *supra*, 5 Cal.5th at p. 77 [compared jurors " 'must be materially similar in the respects significant to the prosecutor's stated basis for the challenge' "]; see also *id.* at p. 83 ["[P]arties with limited peremptory challenges generally cannot excuse every potential juror who has any trait that is at all problematic. They must instead excuse those they believe will be most problematic under all the circumstances."].)

## C.    *Prospective Juror David L.*

David L., a 60-year-old Black man, reported during voir dire that he had been "born deaf," was "hard of hearing," and used a combination of hearing aids and lip reading in order to understand others.  David L. stated that he had made sure that he could hear everything said in the courtroom by sitting in the front.  He claimed he had, in fact, heard everyone, except for a single prospective juror who had spoken softly and did not use the microphone.  He did not see his hearing deficit as a problem.  David L. further recounted that he previously sat on a jury in a criminal case that successfully reached a verdict.  The prosecutor exercised a peremptory challenge to excuse David L. from the jury, and also argued to the court that the prospective juror's hearing issues might be grounds to excuse him for cause.  The trial court disagreed, indicating that David L. had expressed no problems hearing in court and finding it significant that he had been successful serving on a previous jury.  Although the court stated that it was "not in any way diminishing [the prosecutor's] concerns," it felt the record was insufficient to support removal of David L. for cause.

---

[7] For example, Bennett argues that Juror No. 1 was similar because she stated that the criminal justice system was "imperfect."  However, what this juror actually said was that the criminal justice system was "[i]mperfect but way ahead of most countries in the world.  Grateful for it after working in DR Congo with no criminal justice system."  Thus, overall, this juror actually felt positively about the system.

14

After the trial court made this ruling, the prosecutor further explained his position as follows: "[M]y concern wasn't whether he'd be able to sit and listen to witnesses who took the stand and testified. I think there are ways that he could be accommodated in that. [¶] My real concern was over particular snippets of audio that the People would consider important in the case and not just important in the words that were said specifically by Miss Antilea Beal at the BART station shootings but sort of the inflection, the tone of her voice, how she said it in light of other things that were audible or said. And these were things . . . that [David L.] would have to be able to hear without resorting to some of the tools that people who are hard of hearing often can resort to, which is moving themselves closer to a witness or sort of supplementing amplified hearing with an ability to read lips . . . . These would be words spoken by Miss Beal that are difficult to hear even on repeated hearing." The prosecutor further noted: "[I]t's not just my impression. The preliminary hearing magistrate, in a courtroom where we had the audio amplified, said he didn't hear what I indicated was audible on the tape. [¶] So I think it's a struggle to hear. And I think that's what left me of a mind that, despite [David L.'s] best effort, this would be an important piece of evidence that he may well not be able to hear no matter what kind of assistance we tried to provide him."

Thereafter, in ruling on the *Batson/Wheeler* motion with respect to David L., the trial court properly opined that a proffered excuse need not rise to the level of a challenge for cause so long as it is race-neutral. The court noted, however, that the prosecutor felt very strongly (though "entirely appropriately") about the cause challenge. It found that challenge important in the *Batson/Wheeler* context because it concluded that "it shows [the prosecutor's] good faith belief that [David L.] should not serve because he would not be able to hear and thus be able to be presented and receive testimony, critical evidence, which [the prosecutor] believes in good faith." On this basis, the trial court found the prosecutor's challenge of David L. to be both "totally race neutral" and genuine.

The record appears to corroborate the trial court's conclusion. However, appellants cite several arguments in support of their claim that the prosecutor's challenge of David L. due to his hearing issues was pretextual. Preliminarily, appellant's citation to

15

*Crittenden v. Chappell* (9th Cir. 2015) 804 F.3d 998, 1005, 1012—for the proposition that making a meritless cause challenge of a minority juror can evince discriminatory intent—is misplaced on these facts. This was not a situation where it was "well established" that the prosecutor's objection "did not warrant a for-cause challenge." (*Id.* at p. 1005.) Rather, although the trial court ultimately concluded that the factual record was insufficient to support the cause challenge, it stated that its decision should not be viewed as "in any way diminishing [the prosecutor's] concerns" and it later characterized the prosecutor's beliefs underlying the cause challenge as strong, "entirely appropriate[]," and genuine.

In addition, while it is true that David L. stated, and the trial court subsequently found, that the prospective juror could hear "everything in the courtroom," that was not the impetus for the prosecutor's challenge. Rather, as detailed above, the prosecutor was concerned that David L. would not be able to discern words and tone on the audio recordings which he felt were central to the case. Moreover, while transcripts were available, it is reasonable to believe that the prosecutor wanted jurors to hear for themselves the inflammatory tone of Bennett and Beal shortly before the BART shooting. Further, as the Attorney General points out, there were disputes at trial regarding whether the transcripts were accurate. And, indeed, the trial court instructed the jury as follows: "Reasonable minds may differ at counsel table as to whether this transcript is totally accurate or not . . . . If there is any discrepancy in your mind as to what the words are that you hear on the audio portion of these recordings, any discrepancy between what you hear with your own ears and what you see on the page, you accept the words as you hear them as evidence that you may consider in this case." In addition, while appellants argue that the words on the tapes were not relevant, it was not unreasonable, on these facts, for the prosecutor to believe that the prosecution would be aided to the extent the jurors could discern for themselves the words spoken immediately before the shooting by the individuals involved in escalating the confrontation. And, the trial court found this belief to be genuine. (*Hardy*, *supra*, 5 Cal.5th at p. 76 ["The inquiry is focused on whether the proffered neutral reasons are subjectively *genuine*, not on how objectively reasonable

16

they are. The reasons need only be sincere and nondiscriminatory."]; *Lenix*, *supra*, 44 Cal.4th at p. 613 [reasonableness of prosecutor's explanation supports credibility finding].)

Finally, appellants' attempt at comparative juror analysis with respect to David L. is also unavailing. Specifically, appellants point out that Juror Nos. 4 and 7, neither of whom was Black, each indicated that they had hearing issues, but were not challenged by the prosecution. Juror No. 4, however, simply stated during voir dire that it was "a little difficult" the previous day to hear "some of the things because I have a cold and my ear was plugged but today has been fine." Obviously, temporary hearing loss due to illness is not comparable to David L.'s hearing issues. Similarly, Juror No. 7 commented during voir dire that, while he could hear the judge, he had "[b]arely" been able to hear others during the morning session when there was no juror microphone. When asked whether he could hear other jurors that afternoon, after a microphone had been provided, Juror No. 7 responded: "Yes, pretty much." Again, there was no indication that this juror had a serious or systemic hearing issue. Thus, the treatment of these sitting jurors gives us no basis to question the trial court's reasoned conclusion that the prosecutor challenged David L. based on a genuine belief that his hearing deficit would be problematic given the specifics of the evidence involved in this case.[8]

**D.      *Prospective Juror Domanique J.***

On his jury questionnaire, Domanique J.—a 22-year-old Black man who had recently moved to California—indicated that he held a bachelor of fine arts degree in dance and had attended a high school for the performing arts in New York City. Domanique J.'s questionnaire also disclosed that he had an aunt who had been arrested for "drug trafficking"; that he had visited her in jail; and that he, himself, had been

_____

[8] We decline to address Bennett's argument, made for the first time in his reply brief, that the dismissal of David L. violated the prospective juror's civil rights as a disabled person. (See *People v. Mickel* (2016) 2 Cal.5th 181, 197 ["Ordinarily, we do not consider arguments raised for the first time in a reply brief."].) We note only that the prosecutor's reason for utilizing the peremptory challenge was race-neutral and that David L.'s rights are not at issue in these proceedings.

arrested for public intoxication. Domanique J. was uninterested in reading material or video entertainment involving: "Criminal, court, Law & Order, News." And he stated that: "The Criminal Justice System works for the most part but there are cases where I feel the system has not worked."

During voir dire, the prosecutor asked Domanique J. more about his lack of interest in criminal justice-related entertainment, which elicited the following response: "I just, I don't find crime or anything dealing with the court interesting. I mean, if it was up to me, I would rather just not be here." With respect to his arrest for public intoxication, Domanique J. elaborated: "At the time, like the arrest, I guess you would say I didn't feel like I was treated fairly, but I definitely got off very easy. So—." When asked about his aunt's arrest, Domanique J. stated that she was convicted of trafficking drugs (marijuana) and spent four or five years in jail; he was close to her; he "was living there at the time," although he did not go to court with her; he visited her in jail three times; and, when she was released earlier that year, he spoke with her about her case. The prosecutor challenged Domanique J. immediately after he was questioned.

Later, when asked to explain his reasons for the challenge, the prosecutor highlighted the fact that Domanique J. questioned "whether the criminal justice system works for the most part." The prosecutor also noted that "at a time when he was living with his mother, she was arrested and charged and convicted of drug trafficking." The prosecutor felt that "he was living with her at the time, and then the fact that he has visited her in prison, certainly suggests someone who might be prone to sympathy at the prospect of somebody going to prison for a crime."

As discussed above with respect to Pierre M., the trial court found that the prosecutor's challenge based on Domanique J.'s stated belief that the criminal justice system was flawed was legitimate and race-neutral. As for the prosecutor's other articulated reason for challenging Domanique J., the trial court opined, correctly, that "caselaw has repeatedly held that negative experience by the juror or a close relative of the juror [with the criminal justice system], that is a bona fide and genuine and race neutral reason to excuse the juror." (See, e.g., *People v. Cruz* (2008) 44 Cal.4th 636, 655,

18

fn.3 [citing cases]; *Wheeler*, 22 Cal.3d at p. 277, fn. 18 [stating that a "personal experience" with conviction and incarceration "suffered either by the juror or a close relative, has often been deemed to give rise to a significant potential for bias against the prosecution"].) The court noted that Domanique J. "indicated that his mother was arrested for drug trafficking, that he visited her in prison. He was living with her when she was convicted of this crime." Thereafter, the court went even further than the prosecutor on this point, stressing Domanique J.'s own experience with the criminal justice system: "[H]e, himself, had a contact with the criminal justice system, that he had a negative experience with that. He felt that he was not treated fairly, although he seems to admit and acknowledge that what he was arrested for was public intoxication, and he served a very lenient sentence, even by his own standards, which he admitted. But, nevertheless, he harbors the feeling which he expressed here in court, that his experience was a negative one. He doesn't feel that he was fairly treated by the criminal justice system."

On appeal, appellants make much of the fact that both the court and the prosecutor got certain facts wrong during discussion of the *Batson/Wheeler* motion involving Domanique J. Specifically, appellants point out that was Domanique J.'s aunt, not his mother, who was arrested; claim that he was not living with his aunt at the time; and stress that, contrary to the prosecutor's justification, Dominque stated that the criminal justice system does "work for the most part." However, "[w]hile a prosecutor's credibility may be questioned if the prosecutor 'mischaracterizes a juror's testimony in a manner completely contrary to the juror's stated beliefs,' a prosecutor's 'mistake in good faith, such as an innocent transposition of juror information,' does not support a finding that the prosecutor is not credible." (*Sifuentes v. Brazelton* (9th Cir. 2016) 815 F.3d 490, 512; see also *People v. O'Malley* (2016) 62 Cal.4th 944, 980 ["prosecutor's mistaken reference . . . alone does not establish that the prosecutor's stated reasons were pretexts for discrimination"]; *People v. Williams* (2013) 56 Cal.4th 630, 661 [no *Batson/Wheeler* violation when the prosecutor excused a prospective juror for a factually erroneous but

19

race-neutral reason]; *People v. Williams* (1997) 16 Cal.4th 153, 189 ["a genuine 'mistake' is a race-neutral reason"].)

Here, while misstatements were certainly made, we do not find them significant. As such, they do not supply a basis for finding the prosecutor not credible. For example, it is true that Domanique J. did not, as the prosecutor stated, question "whether the criminal justice system works for the most part." Rather, he said: "The Criminal Justice System works for the most part but there are cases where I feel the system has not worked." Thus, while he misspoke, the prosecutor was correct in his belief that Domanique J. felt that the system sometimes does not work. And, as stated above, the trial court found this proffered justification (flawed criminal justice system) to be credible and race-neutral. Similarly, with respect to the incarcerated relative, it was clearly Domanique J.'s aunt rather than his mother. Moreover, when asked whether they were close, Domanique J. stated: "Yes. I was living there at the time, I didn't go [to] the court, but I was around her, the relatives when it was going on." While this was perhaps ambiguous as to whether the prospective juror lived in the same house or just in the same geographic area as his aunt, at bottom, the record supports that Domanique J. had a close relative; that he was around her while she went through the court process; that she was incarcerated for a significant period on drug trafficking charges; and that he visited her multiple times during her incarceration. The trial court found this a valid and race-neutral reason to challenge Domanique J. and we see no error in this regard, despite the minor misstatements that were made.

Finally, we reject again appellants' attempt to marshal comparable jurors, here arguably to show that they had experiences with incarceration similar to Domanique J., but were not challenged by the prosecutor. Juror No. 3's questionnaire disclosed that, 30 years ago, the juror had visited an inmate at Vacaville Prison. The individual apparently was not a relative or close friend. Juror No. 12 indicated that "years ago" she picked up her brother at the Santa Rita Jail after he had been arrested on a domestic violence charge for which he was never prosecuted. And Juror No. 12 stated that he worked as a counselor at a correctional facility for six months during graduate school. Obviously,

20

none of these experiences compares with visiting a close relative convicted of a serious crime on multiple occasions while she was incarcerated. Appellants also suggest the same comparable jurors on the issue of the fairness of the criminal justice system that they advanced in their challenge to Pierre M. But this attempt fails here for the same reason: None of those jurors had any other serious disqualifying issue, such as Domanique J.'s experiences regarding his aunt's incarceration or Pierre M.'s problems with the one witness rule. Thus, they were not similarly situated.[9]

In sum, the trial court here considered at length the prosecutor's reasons for challenging each of the three prospective jurors discussed above, concluded that all of the proffered reasons were valid and race-neutral, and expressly found the prosecutor credible and his justifications genuine. We see no *Batson/Wheeler* error on this record, and certainly no abuse of discretion.

### III. OTHER ISSUES RAISED BY BENNETT

*A.* *Jury Instructions on Transferred Intent and Imperfect Self-Defense*

As discussed above, Bennett's defense to the BART shooting in which Seets, an innocent bystander, was killed was that he was shooting at Smith and/or Askari in either complete or imperfect self-defense. Complete self-defense is established when "the defendant believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and believes the acts which cause the victim's death are necessary to avert the threat, and these beliefs are objectively reasonable." (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357 (*Curtis*); see also *People v. Randle* (2005) 35 Cal.4th 987, 994 (*Randle*), overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) "Self-defense negates culpability for assaultive crimes, whether or not the assault

---

[9] Indeed, the record supplies additional reasons to conclude that Domanique J. was not similarly situated to these other jurors because, in addition to the two reasons for the challenge advanced by the prosecutor, Domanique J. had also, himself, been convicted of a crime, as the trial court noted. Further, Domanique J. appears to have also had issues with the one witness rule and he expressed a lack of interest in the criminal justice system and a desire not to serve as a juror. Thus, there were many race-neutral reasons why his inclusion on the jury might have been troubling to the prosecutor.

21

results in death." (*People v. Adrian* (1982) 135 Cal.App.3d 335, 340.) In contrast, "[i]mperfect self-defense applies where the defendant actually believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and actually believes the acts which cause the victim's death are necessary to avert the threat, but these beliefs are objectively unreasonable. [Citation.] Imperfect self-defense is not a complete defense to homicide. However, it negates malice aforethought and thereby reduces a homicide which would otherwise be murder to voluntary manslaughter." (*Curtis*, at pp. 1354–1355; see also *Randle*, at p. 994; *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446 ["unreasonable or imperfect self-defense is not a true defense, but instead is a shorthand description of one form of voluntary manslaughter, a lesser included offense of murder"].)

The additional wrinkle in this case is that Bennett killed an innocent bystander rather than the individuals he claims to have perceived as an imminent and unlawful threat. On these facts, the doctrine of transferred intent also applies. Under that doctrine, "just as 'one's criminal intent follows the corresponding criminal act to its unintended consequences,' so too one's *lack* of criminal intent follows the corresponding *non-criminal* act to its unintended consequences. [Citation.] Thus, a defendant is guilty of no crime if his legitimate act in self-defense results in the inadvertent death of an innocent bystander." (*People v. Levitt* (1984) 156 Cal.App.3d 500, 507 (*Levitt*), disapproved on another point as stated in *People v. Johnson* (2016) 62 Cal.4th 600, 649, fn. 6; see also *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1023–1024.)

Bennett's trial counsel requested the following instruction discussing the application of transferred intent to both complete and imperfect self-defense: "When a person acts in self-defense and his act inadvertently results in the death of a[n] innocent bystander, the crime, if any, is the same as if he had acted in self-defense against the person he believed to pose an imminent threat of deadly peril. This rule applies to both reasonable and unreasonable self-defense." There was considerable discussion among the court and counsel as to how this concept should be incorporated into the jury instructions, with various counsel objecting to a number of different suggestions. In the

22

end, the trial court went with a modified version of CALJIC 8.65, incorporating the *Levitt* language set forth above: "When one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed had been killed. [¶] The doctrine of transferred intent is available as a defense. Just as one's criminal intent follows the corresponding criminal act to its unintended consequences, so [too] one's lack of criminal intent follows the corresponding non-criminal act to its unintended consequences. . . . Thus, a defendant is guilty of no crime if his legitimate act in self-defense results in inadvertent death of an innocent bystander."

On appeal, Bennett argues that the trial court's instruction on transferred intent was erroneous—not because it is an incorrect statement of the law—but because it is incomplete and therefore misleading. Specifically, he asserts that it improperly failed to instruct the jury that transferred intent could also apply to imperfect self-defense and thus reasonable jurors would infer that the doctrine did not apply in that context. A criminal defendant " 'has a constitutional right to have the jury determine every material issue presented by the evidence.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) Thus, when a defendant requests instructions on a legally correct defense, the charge must be given if it is supported by evidence " ' "sufficient to raise a reasonable doubt" ' " if believed by the jury. (*People v. Mentch* (2008) 45 Cal.4th 274, 288.) When, as here, the argument on appeal is that the instruction given was ambiguous, " 'we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.] ' " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " ' [Citation.] The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202 (*Young*).) Application of these standards to the facts of this case makes clear that no instructional error occurred.

First, as delineated above, the court properly instructed the jury regarding the concept of transferred intent and indicated that it was also "available as a defense,"

23

giving the example that no crime occurs when a defendant inadvertently kills an innocent bystander while acting in "legitimate" self-defense. Nothing in the instruction indicates that the example given was meant to be exclusive. In addition, the jury was instructed regarding the elements of both complete and imperfect self-defense and was repeatedly instructed regarding the consequences of a finding of imperfect self-defense in this case. For instance, the jury was told on three separate occasions that murder requires malice aforethought while manslaughter does not and that "[t]here is no malice aforethought if the killing occurred . . . in the actual, but unreasonable belief in the necessity to defend oneself or another person against imminent peril to life or great bodily injury." The jury was also instructed that the burden in this regard was on the People: "To establish that a killing is murder and not manslaughter, *the burden is on the People to prove beyond a reasonable doubt* each of the elements of murder and *that the act which caused the death was not done . . . in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury*." (Italics added.) As the Attorney General correctly emphasizes, the only death at issue in this case was the death of Seets, an innocent bystander who Bennett clearly did not intend to kill. Thus, conviction for *any crime* would require the transfer of Bennett's applicable mental state from Smith and/or Askari to Seets. Under such circumstances, there would have been absolutely no reason for instructing the jury repeatedly and at length with respect to imperfect self-defense unless transferred intent was applicable in that context. It is therefore exceedingly unlikely that the jury failed to understand that imperfect self-defense was available as an option for reducing Bennett's murder charge to manslaughter.

This conclusion is reinforced by our review of the closing arguments made to the jury. (See *Young*, *supra*, 34 Cal.4th at p. 1202 [reviewing court must consider the arguments of counsel in assessing the probable impact of the an instruction on the jury]; see e.g., *People v. Garceau* (1993) 6 Cal.4th 140, 189 [any possibility of confusion about conspiracy instruction was diminished by the parties' closing arguments], disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118.) Bennett's trial

24

counsel discussed complete and imperfect self-defense, noting that both cancel out malice. He then explicitly laid out the manslaughter options available to the jury in this case as follows: "*Only if you find that that unreasonable belief in self-defense accompanied the intent to kill, can you find [Bennett] guilty of voluntary manslaughter.* If you find that [the prosecutor] has failed to prove beyond a reasonable doubt that he actually intended to kill Andre Smith, *which then transfers to Kenneth Seets*, then you have to find him guilty of involuntary manslaughter." (Italics added.) In addition, the prosecutor acknowledged that imperfect self-defense is "something to discuss in this case," acknowledged that it was the People's burden to prove that Bennett did not act "reasonably and honestly in self-defense, or honestly but unreasonably in self-defense," and urged the jury to find that Bennett was "not in any way entitled to any reduction of culpability because of self-defense law" due to the choices he made leading up to the BART shooting.

In sum, there is no reasonably likelihood, indeed no real likelihood at all, that the jury misunderstood how to apply the concept of transferred intent on these facts.

## B. *Impact of Provocative Act Murder Instruction on Self-Defense Claim*

As stated above, Smith was also charged with the murder of Seets under a "provocative act" theory. Provocative act murder describes a type of murder in which, during the commission of a crime, someone other than the defendant is provoked by the defendant's conduct into a response that results in death. (*People v. Concha* (2009) 47 Cal.4th 653, 663 (*Concha*).) Here, the prosecution argued that by putting his hand on the gun in his waistband and walking forward aggressively toward Bennett's group, Smith committed a provocative act sufficient to make him culpable for Seets's murder based on Bennett's foreseeable reaction. In this regard, the jury was instructed in accordance with CALCRIM 560 that, to establish Smith's guilt for second degree murder under a provocative act theory, the People were required to prove: (1) that in exhibiting a firearm in a rude, angry or threatening manner in violation of section 417, subdivision (a)(2), Smith intentionally did a provocative act; (2) that Smith knew that the natural and probable consequences of the provocative act were dangerous to human life and then

25

acted with conscious disregard for life; (3) that, in response to Smith's provocative act, Bennett killed Seets; and (4) that Seets's death was the natural and probable consequence of Smith's provocative act. The jury was further instructed that a person commits the crime of brandishing for purposes of section 417, subdivision (a)(2), by drawing or exhibiting a firearm (whether loaded or unloaded) in the presence of another person; in a rude, angry, or threatening manner; and not in self-defense. Finally, the jury was told that a "provocative act" in this context is an act that *goes beyond* what is necessary to establish a brandishing violation and is one where the natural and probable consequences are dangerous to human life—i.e., there is a high probability that the act will provoke a deadly response. After deliberation, the jury acquitted Smith of any culpability for Seets's death.

Bennett now challenges the trial court's jury instruction on provocative act murder. Specifically, he contends that the trial court erred in instructing the jury that something *beyond* what was necessary to establish a brandishing violation was required to prove a provocative act. He further argues that the instructional error was prejudicial to him, even though targeted at Smith, because the prosecutor tried Smith and Bennett on conflicting theories. Under these circumstances, Bennett asserts, the stronger the prosecution's case for provocative act murder became against Smith, the weaker its case for murder became against Bennett, because establishing that Smith committed a "provocative act" supported Bennett's claim of either complete or imperfect self-defense. Thus, Bennett reasons, by improperly inflating the requirements for proving Smith committed a provocative act, the court made it harder for Bennett to establish that he acted in self-defense. We are not convinced.

Preliminarily, on these facts, the trial court appears to have properly instructed the jury that, to find Smith guilty of murder, he had to do something beyond merely exhibiting his firearm. The idea behind a provocative act murder charge is that the malice necessary for a murder conviction "may be implied if the defendant commits an act with a high probability that it will result in death and does so with a base antisocial motive or a wanton disregard for human life." (*People v. Briscoe* (2001)

26

92 Cal.App.4th 568, 583 (*Briscoe*).) Thus, "[i]n cases in which the underlying crime does not involve an intent to kill . . . the mere participation in the underlying criminal offense is not sufficient to invoke the doctrine of provocative act murder. The provocative act must be something beyond that necessary to commit the underlying crime." (*Id.* at pp. 582–583; *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 59–60 (*Aurelio*).) This is because some further act is required from which malice can be implied. (*Concha*, *supra*, 47 Cal.4th at p. 662; see *Aurelio*, at p. 59 [noting that using a gun to threaten employees into surrendering cash does not necessarily imply an intent to shoot, and thus some further provocative act is required to establish the necessary state of mind for murder].) In contrast, where the underlying crime necessarily supplies the requisite malice, the crime, itself, becomes the provocative act. (See *Aurelio R.,* at p. 60 [crime of driving into rival gang's territory with specific intent to shoot a member of that gang inherently involved intent to kill and thus no further provocative act need be proven].) Since, in this case, Smith could have committed simple brandishing merely by lifting his shirt and showing his gun in an angry manner—an act which does not necessarily imply an intent to kill—it appears that the trial court correctly instructed the jury that something more than brandishing was necessary in order to establish the appropriate mental state to support a murder conviction.

We need not finally resolve this issue, however, because we conclude that, even were we to assume that Bennett has correctly identified instructional error, any such assumed error was entirely harmless under the facts of this case. In short, the record— which included multiple video recordings of the incident—clearly establishes that Smith did do something in this case beyond simply exhibiting his firearm. Based on Smith's own admission, he put his hand on the gun at his waist, clenched it, and, as the video shows, he then took a number of steps towards Bennett's group. And Askari reported that, as his brother walked toward Bennett, Smith had his hand on his gun and looked like he was going to get it and shoot. The prosecutor expressly highlighted the importance of these additional facts in his closing arguments, stating: "[Smith] admitted he had a gun. He admitted he had his hand clenched on a gun. He admitted—and this is the additional

27

act, in the provocative act murder theory, when it says, a person has to commit an act and it can be a misdemeanor. The law provides for that. [¶] . . . [¶] So it is not just a simple brandishing that [Smith] engages in. It is putting his hand on the grip of a gun and walking forward under the circumstances of this case. That's what his conduct is that is implied malice. And it makes it a concurrent proximate cause."[10] In fact, Bennett's own argument on appeal—that Smith's act of walking toward Bennett in a hostile manner while visibly clenching a handgun was assault with a firearm under section 245, subdivision (a)(2), and thus should have been viewed as sufficient in and of itself to establish a provocative act—whether or not true, is just another way of saying that something more than brandishing occurred here. Under these circumstances, had the jury otherwise found that the requirements for provocative act murder had been met, the need to find an act beyond mere brandishing would clearly not have stood in the way of a conviction. Thus, any related instructional error was manifestly harmless.

## C. *Exclusion of Purry's Prior Statements*

During the trial in this matter, Bennett's attorney filed a motion to admit certain remarks made by Purry to BART detectives shortly after the BART shooting. Purry had described an event which occurred when he, Smith, and Askari ran into each other immediately before they walked over to the bus station together on the day of the shooting. Specifically, he reported that Smith approached him, lifted his shirt to display a handgun at his waistband, and asked Purry if he was ready to " 'funk,' " meaning to shoot it out or go to war. Apparently, Smith was upset because he and Purry had previously

---

[10] It is for this reason that we also question Bennett's view of the interrelationship between the murder charges brought against him and Smith, such that an error in an instruction targeted at Smith's culpability could cause prejudice to Bennett. The evidence in this case showed what it showed. As illustrated above, the prosecutor consistently argued that it was sufficient to convict *both* Smith and Bennett of murder. And the jury was specifically instructed that more than one defendant could be found culpable for Seets's death if their conduct was "a substantial factor contributing to the result." The fact that the jury declined to convict Smith based on the evidence presented, however, does not mean that the same evidence was necessarily insufficient to support Bennett's self-defense claims, especially his claim of imperfect self-defense.

been housed in a group home together, but Smith was kicked out after a fight with Purry. Purry claimed he was unsure about what to do, so he showed Smith part of a realistic toy gun he was carrying in his waistband. He also asked Askari—who he knew—why his brother (Smith) was threatening him. These actions appeared to deescalate the situation. As Smith put it: "[W]e squashed it right there." Askari testified at trial that he observed Purry and Smith seeming to have a disagreement. Later, however, they shook hands, and all three smoked marijuana together.

During both the preliminary hearing and the trial in this matter, Purry invoked the Fifth Amendment and refused to testify. The prosecutor offered Purry use immunity at trial, but Purry still refused to answer questions. The trial judge then held Purry in contempt of court. Since this made Purry unavailable as a witness (Evid. Code, § 240, subd. (a)(6)), Smith's trial counsel subsequently sought to admit his prior statements to the police as declarations against interest (*id*., Evid. Code, § 1230.) Smith objected, arguing that admission of the Purry evidence would violate his rights under the confrontation clause of the Sixth Amendment. The trial court agreed, excluding the evidence on Sixth Amendment grounds.

Bennett now avers on appeal that the trial court's refusal to admit Purry's statements violated his constitutional right to present a defense. He does not challenge the trial court's conclusion that admission of the evidence would have violated Smith's confrontation clause rights.[11] Rather, Bennett asserts that the trial court erred by

---

[11] Indeed, it would be difficult for him to do as, under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), it is generally a violation of the confrontation clause to admit testimonial hearsay against a criminal defendant "unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680 (*Sanchez*), discussing *Crawford*.) Here, as described above, Purry was unavailable and had never been subject to cross-examination, having refused to testify both at the preliminary hearing and at trial. A testimonial statement is one " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Crawford*, *supra*, 641 U.S. at p. 52.) Thus, it is difficult to argue that Purry's recorded statements to law enforcement during the course of the investigation into the BART shooting were not testimonial

29

elevating Smith's constitutional right to confrontation over his constitutional right to present a defense. He further contends that the trial court erred in failing to consider admitting the evidence as to Bennett only, with a limiting instruction.

Although Bennett expressly requested during trial that Purry's statements be admitted as declarations against interest, he failed to raise either of the specific contentions he now asserts and thus has arguably forfeited them. (See *People v. Smith* (2003) 30 Cal.4th 581, 629-630.) However, even if no forfeiture occurred, we need not reach the merits of Bennett's claims, including his alternative claim of ineffective assistance of counsel. Rather, we conclude that exclusion of the Purry evidence, even if error, was harmless under the facts of this case.

As emphasized above, Bennett defended himself in the trial court with respect to the BART shooting on the ground that he fired in either complete or imperfect self-defense when Smith approached him in a hostile manner and displayed his handgun, while clenching it. Bennett claims that the exclusion of Purry's statements was prejudicial because this evidence would have corroborated his own testimony that he saw a handgun in Smith's waistband and would have supported a pattern of aggressive behavior by Smith. However, Purry's statement could not corroborate Bennett's claim that he *saw* Smith's gun, only that Smith had a gun. And, as the Attorney General points out and as discussed above, Smith's admission to the police that he had the gun in his waistband, clenched it, and walked toward Bennett was already in evidence and definitively established this fact. Thus, the Purry evidence was, at best, duplicative. Moreover, given that Smith's advance on Bennett's group was captured on videotape, the jury could judge for itself the level of threat telegraphed by Smith's actions. Indeed, even

within the meaning of the Sixth Amendment. (See *Sanchez*, *supra* 63 Cal.4th at p. 687 [" '[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard,' " quoting *Crawford*].) Finally, the dangers inherent in improperly admitting such evidence were well illustrated in this case by the prosecutor's somewhat playful comments that he would "absolutely endorse" the admission of the statements at issue because they would make Smith "look worse" and "nobody would get to cross-examine [Purry]."

if Smith had been similarly aggressive a few minutes previously, Bennett was not aware of that when he made the decision to shoot first. He had only the same information that was presented to the jury through videotape and the testimony of eyewitnesses to the event. Thus, it is difficult to see how Purry's statements could have aided Bennett's defense in any meaningful way. Indeed, if the jury saw the prior incident between Purry and Smith as evidence that Smith would likely have deescalated after both parties showed their guns, it might actually have harmed Bennett. Under such circumstances, it is not reasonably probable that the jury would have reached a more favorable verdict had the Purry evidence been admitted. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)[12] Accordingly, we find any assumed error with respect to the exclusion of this evidence harmless.

## D. *Admission of Facebook Photo Captions*

As stated above, Walton, Jordan's cousin, testified at trial that Jordan identified Bennett as his assailant shortly after the shooting and showed her photos of Bennett on Facebook. Walton took pictures of the photos and eventually forwarded them to the police. As Bennett testified at trial, the photos depict he and a friend posing with guns, with Bennett displaying his middle finger. Bennett's objection to the admission of these photos without some kind of limiting instruction was denied by the trial court. Later,

---

[12] We reject Bennett's assertion that the proper standard on review of this issue is the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) Although " 'completely excluding evidence of an accused's defense' " theoretically could impair the accused's constitutional right to present a defense, " 'evidence on a minor or subsidiary point does not.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428.) " 'If the trial court misstepped, "[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." ' " (*Ibid*.) As we explained above, exclusion of the Purry evidence did not completely preclude Bennett from presenting his defense. Rather, his own testimony, Smith's admissions, the video surveillance, and the statements of eyewitnesses all arguably supported his self-defense claim. (Compare *People v. Carlin* (2007) 150 Cal.App.4th 322, 335 [where defendant testified on his own behalf, he was not precluded from presenting a defense].) Thus, the appropriate standard is that articulated by *Watson* rather than *Chapman*.

Bennett moved to redact the captions which were posted along with the Facebook photos, arguing that they were hearsay given Bennett's testimony that he did not post them and had not seen them on his Facebook feed. Reportedly, two of the captions read: "lil brie n lil kc ya ya mobbin." And the third stated: "mobbsta mobb get ya hammas up." The trial court denied the motion to redact the captions as well, admitting the three Facebook photos as is.

On appeal, Bennett does not challenge the admission of the photos. Rather, he claims that the captions on the photos were inadmissible hearsay because there was no evidence that he posted them or otherwise adopted them. The Attorney General, in contrast, correctly points outs that we review evidentiary decisions for abuse of discretion, keeping in mind that "a trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception [citation] and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto.' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.) Under this standard, the Attorney General posits that the trial court could have found Bennett's testimony that he was unaware of the Facebook post not credible and/or could have inferred that a friend would not post such pictures to Bennett's Facebook page without Bennett's acquiescence, thereby finding the captions admissible as adoptive admissions. (See *id.* at p. 133.)

Preliminarily, we are not convinced that the challenged statements were admitted for any kind of "truth," other than as a colorful verbal description of what the photos, themselves, already showed: two teenagers, "lil brie" (Bennett) and "lil kc," playing at being "mobbstas." Thus, in a sense, the captions merely reflected what Bennett's own posturing already showed. However, we need not determine whether the trial court erred in refusing to redact the photo captions here at issue because we once again conclude that, even were we to assume error, it was harmless under the facts of this case. Bennett, himself, testified that he was part of a close group of friends that called themselves the Monster Mob after one of the girls in the group nicknamed " 'Little Monster.' " He denied that they were a gang. In describing the incident during which the pictures were

32

taken, Bennett stated that a friend brought two unloaded guns out of his parents' bedroom for Bennett and a third friend to see. He admitted that he agreed to take photos with the guns; that the photos were of him and a friend posing with the guns; and that he was holding up his middle finger in the photos because that was his standard (though regrettable) picture pose. There was also evidence from Beal to the effect that Bennett was trying hard to be a thug or gangster. Given the other evidence presented, the wording in the captions added little to this ancillary issue.

With respect to the BART shooting, for instance, the photos, themselves, could certainly be viewed as supporting the conclusion that Bennett had some familiarity with guns and was trying to be a "mobbsta," determinations which could perhaps have undermined his argument that he acted in either complete or imperfect self-defense. Arguably, however, such evidence could also support an argument that he understood street life and thus the danger inherent in Smith's actions at the BART station. Certainly, we do not see how the addition of the captions to the mix of evidence can be viewed as materially and negatively impacting Bennett's defense against this murder charge.

With respect to the Oakland shooting, the evidence that Bennett was Jordan's shooter was strong. As we have discussed, the same gun Bennett used during the BART shooting was also used two days earlier to shoot Jordan. Walton's testimony, corroborated by the Facebook photos, indicated that Jordan had identified Bennett as his shooter while still in the hospital, well before the police were aware that the shell casings from the two crimes matched. Further, although Jordan steadfastly refused to identify Bennett as his shooter, at trial he admitted that he and Bennett had a physical altercation immediately before the shooting. Bennett, for his part, admitted he knew Jordan, but testified they did not have a bad relationship and he could not imagine why Jordan would falsely accuse him. Although Bennett admitted he knew the name of the individual who sold him the gun, he refused to disclose it. He conceded that he never investigated whether the gun dealer knew who shot Jordan; admitted that the police did not match the shell casings in the two cases until several months after Jordan identified him as the shooter; and acknowledged the coincidence that he happened to have the same gun two

33

days later at the BART station. Bennett defended himself by claiming that he purchased the gun on January 18th, the day between the two shootings, and suggesting that Jordan and Walton were somehow protecting Jordan's actual shooter by incriminating Bennett. Again, we can see no way in which the challenged captions could be viewed as materially affecting Bennett's guilt or innocence with respect to the charged shooting. We therefore conclude that the admission of the photo captions, even if error, was harmless.[13]

## E.    *Remand for Resentencing*

Finally, we must consider, with respect to Bennett, a sentencing issue brought to our attention in this case via supplemental briefing from the parties. At the time it sentenced Bennett, the trial court had no discretion to strike the two firearm enhancements it imposed under section 12022.53. (Former § 12022.53, subd. (h).) Thereafter, in October 2017, the Legislature passed Senate Bill 620, which took effect on January 1, 2018. Pursuant to this legislation, amended section 12022.53 now provides that "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (§ 12022.53, subd. (h); *People v. McDaniels* (2018) 22 Cal.App.5th 420, 424–425 (*McDaniels*).) The authority provided by the amended statute "applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h); see also § 12022.5, subd. (c) [similar language applicable to enhancements under § 12022.5].) Recently, our colleagues in Division One of this District concluded that newly amended subdivision (h) of section 12022.53 applies retroactively to nonfinal judgments, such as the one at issue in this appeal. (See *McDaniels*, at pp. 424-425.) Other Districts have reached a similar conclusion with respect to both subdivision (h) of section 12022.53 and subdivision (c) of section 12022.5. (See, e.g., *People v. Billingsley* (2018) 22

---

[13]  Bennett argues that the cumulative effect of the alleged errors at his trial require reversal of his conviction, even if none alone were individually prejudicial. As our review of the case has uncovered no substantial error in any respect, we also reject his argument of cumulative prejudice. (See *People v. Butler* (2009) 46 Cal.4th 847, 885.)

Cal.App.5th 1076, 1079-1080; *People v. Vela* (2018) 21 Cal.App.5th 1099, 1113-1114.) Indeed, the Attorney General here concedes as much.

Under such circumstances, "remand is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement." (*McDaniels, supra,* 22 Cal.App.5th at p. 425.) The Attorney General posits that, under this standard, remand is unnecessary in this case because the trial court's actions at sentencing show that it would not strike the firearm enhancements on remand. Specifically, the Attorney General points to the refusal of the trial court to impose Bennett's two sentences—32 years to life for the attempted murder and 40 years to life for murder—concurrently rather than consecutively, despite its serious consideration of the "many voices" that spoke on Bennett's behalf. We agree with the Attorney General that the trial court's sentencing determination may indicate that it believed something more than 40 years to life was appropriate on these facts. However, even were we to deem this a clear indication of the trial court's intent on that point, nothing in the record rules out the possibility that the trial court might exercise its discretion on remand to strike one of Bennett's two firearm enhancements, or to strike both in favor of shorter enhancements under other statutes that were previously stayed. We thus conclude that remand on this issue is appropriate. "While we express no opinion on how the court should exercise its discretion on remand, that discretion is for it to exercise in the first instance." (*McDaniels*, p. 428.)

## IV. OTHER ISSUES RAISED BY SMITH

All of Smith's remaining arguments on appeal arise out of the trial court's April 2014 denial of his new trial motion, filed after the jury found him guilty of unlawful possession of a firearm. Smith's burden to prove error on appeal in this context is a heavy one. "The trial court has broad discretion in determining whether the evidence has sufficient probative value to sustain the verdict [citation], and its order will not be reversed on appeal 'absent a manifest and unmistakable abuse of that discretion.' " (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1252 (*Dickens*); see also *People v. Lightsey* (2012) 54 Cal.4th 668, 729.) In particular, an "appellate court reviews the

35

evidence in the light most favorable to the trial court's ruling, drawing all factual inferences that favor the trial court's decision." (*Dickens*, at p. 1252*.*) And, "[t]he trial court's factual findings, express or implied, will be upheld if supported by any substantial evidence." (*Ibid.*; see also *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1303–1304 ["Generally, we review the record in a criminal appeal by reading it most favorably to the prosecution, indulging every reasonable intendment in favor of the judgment."])

Here, Smith asserts that a new trial was warranted because there was insufficient evidence of the corpus delicti of the offense absent his own admissions. He additionally claims that certain statements made by jurors after deliberations support a new trial in this case because they show that the jury did not follow the law in convicting him of unlawful possession of a firearm. Finally, Smith argues that the prosecutor's misconduct in misstating the law of corpus delicti during his closing comments to the jury justifies a new trial. We address and reject each contention in turn.

## A. *Proof of Corpus Delicti*

Smith first argues that a new trial was required because there was insufficient evidence that he possessed a firearm apart from his own admission to that effect. "To convict an accused of a criminal offense, the prosecution must prove that (1) a crime actually occurred, and (2) the accused was the perpetrator. Though no statute or constitutional principle requires it, California, like most American jurisdictions, has historically adhered to the rule that the first of these components—the corpus delicti or body of the crime—cannot be proved by *exclusive* reliance on the defendant's extrajudicial statements." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1164-1165.) The purpose of this rule is "to assure that 'the accused is not admitting to a crime that never occurred.' " (*People v. Jones* (1998) 17 Cal.4th 279, 301.) However, "[t]he amount of independent proof of a crime required for this purpose is quite small; we have described this quantum of evidence as 'slight' [citation] or 'minimal'[citation]. The People need make only a prima facie showing ' "permitting the reasonable inference that a crime was committed." ' [Citation.] The inference need not be 'the only, or even the most compelling, one . . . [but need only be] a *reasonable* one' " (*Id.* at pp. 301-302.)

36

Under these standards, we agree with the Attorney General that the corpus delicti of the charged crime was established in this case. Bennett testified that Smith lifted his shirt up and he saw a gun. Beal testified that she "definitely" saw Smith clutching an object as he moved towards them. And, when asked whether she told the police that she saw Smith grabbing the handle of a gun, Beal replied: "Yes, sir, that's what I made of it." In addition, Roland testified both that he saw Smith with a gun and that Smith put his hand to his waist as he walked toward Bennett's group "like he had a gun." And Smith's own brother stated that when Smith was walking towards Bennett's group, he looked like he was going to get his gun and shoot. While the credibility of these witnesses was certainly open to question, their testimony supplies some evidence from which the jury could reasonably infer that Smith had a gun. In addition, the jury could have reasonably inferred from viewing video of the BART shooting that Smith's posture as he advanced towards Bennett's group suggested that he was armed.

Moreover, Smith's argument that Bennett, Beal, and Roland lacked credibility and thus their statements that he had a gun do not supply substantial evidence of that fact misapprehends the corpus delicti requirement. "[O]nce the necessary quantum of evidence is present to satisfy the corpus delicti rule, the defendant's extrajudicial statements may be considered for their full value to strengthen the case on all issues." (*In re I.M.* (2005) 125 Cal.App.4th 1195, 1205.) Because, as stated above, there was some evidence that Smith possessed a gun during the BART shooting aside from his admission on that point, the trial court could then properly consider Smith's admission in finding that there was substantial evidence supporting the jury's verdict. We see no abuse of discretion.

## B. *Juror Statements Regarding Deliberation*

We next reject Smith's argument that, in reviewing the trial court's denial of his new trial motion, we should consider statements reportedly made by certain jurors after the verdicts in this case. Specifically, a declaration filed by Smith's trial counsel in support of his new trial request indicates that three jurors told counsel after the trial that they did not believe the testimony of Bennett, Beal, and Roland that they saw Smith's

37

gun. Instead, the only evidence that they considered in convicting Smith of gun possession was Smith's own admission that he had a gun on the day of the BART shooting. In addition, according to Smith's trial counsel, she ran into a fourth juror several days later who confirmed that the jury only considered Smith's admission in reaching its verdict. This, despite the fact that the jury had been expressly instructed in accordance with CALJIC 2.72 that "[n]o person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside of this trial."

However, as the Attorney General correctly points out: "Hearsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an evidentiary hearing." (*People v. Manibusan* (2013) 58 Cal.4th 40, 55; see also *People v. Dykes* (2009) 46 Cal.4th 731, 811 [" ' "a jury verdict may not be impeached by hearsay affidavits" ' "]; *People v. Villagren* (1980) 106 Cal.App.3d 720, 729 [same].) Moreover, the type of hearsay offered in this case—focusing as is does on the deliberative process of the jurors in reaching their verdict—is expressly inadmissible under Evidence Code section 1150. Pursuant to that statute: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible* to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or *concerning the mental processes by which it was determined*." (Evid. Code, § 1150 subd. (a), italics added.) The reason for this rule is clear: "Asking jurors to revisit the process by which they reached a verdict plainly opens the door to postverdict jury tampering, harassment of jurors, and instability of verdicts." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1281; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1262 ["Not all thoughts 'by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But such [thoughts] cannot impeach a unanimous verdict; a jury

38

verdict is not so fragile.' "]; *People v. Morris* (1991) 53 Cal.3d 152, 231 [" '[A] verdict may not be impeached by inquiry into the juror's mental or subjective reasoning processes, and evidence of what the juror "felt" or how he [or she] understood the trial court's instructions is not competent.' "], disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)  Since reliance on the proffered juror statements in this case would have been patently improper, the trial court did not abuse its discretion in refusing to grant a new trial based on this inadmissible evidence.

## C.      *Prosecutor's Closing Statements Regarding Corpus Delicti*

Finally, we consider Smith's claim of prosecutorial error.[14]  Smith argues that the prosecutor misstated the law of corpus delicti in his rebuttal closing argument. Specifically, he points to the following argument by the prosecutor:  "Now, the job for you is to assign criminal responsibility to various actors who were responsible, and somebody's admission can come in for that, including when she says, we can't prove he had a gun outside of his admission.  You don't need anything more than that.  You don't need anything more than that.  And if he admits he had a gun, you can take that as a proved fact."

" ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'  [Citations.]  In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Tully* (2012) 54 Cal.4th 952, 1009–1010.)

---

[14] As suggested by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn.1, we use the term "prosecutorial error" rather than "prosecutorial misconduct" when referring to the challenged conduct in this case in order to more accurately reflect that no showing of bad faith is required to establish the error.

It is error for the prosecutor to misstate the applicable law.  (*Hill*, *supra*, 17 Cal.4th at p. 829.)  However, " '[t]o prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Dykes, supra,* 46 Cal.4th at pp. 771–772.)  In particular, "we presume the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Sanchez* (1995) 12 Cal.4th 1, 70, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *Dykes*, at p. 772 [" 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' "].)  Generally, a trial court's rulings on prosecutorial misconduct are reviewed for abuse of discretion.  (*People v. Peoples* (2016) 62 Cal.4th 718, 792–793.)

In the present case, when read in context, it is not entirely clear what the prosecutor was suggesting when making the challenged assertions.  He appears to have been arguing about the murder charge on which Smith was acquitted, rather than the gun possession charge which is here at issue.  However, we need not determine whether his brief comments otherwise amount to prosecutorial error because, on this record, we cannot find that there is a "reasonable likelihood" the jurors would have relied upon the prosecutor's statements and ignored the law as articulated to them by the court.  First, we note that Smith's own trial attorney, in her closing argument, commented:  "Lawyers are not the final word of the law.  We tend to mangle things . . . .  The judge will tell you what the law is, and he knows it.  And he has it written down, and he is not going to make a mistake.  But I might."  She also specifically referenced corpus delicti; informed the jurors they would receive an instruction; correctly stated the law; and argued that there was no corroborating evidence that Smith had a gun.  Thereafter, at stated above, the jury was expressly instructed that "[n]o person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside of this trial."

In addition, the jury was instructed that "the statements made by counsel in their closing statements [are] not evidence in the case." The jury was also admonished by the court that it should only apply the law as set forth in the court's instructions: "If there is a variance between what any attorney says the law is and what I tell you it is, you accept the law as I state it to you." Indeed, variations on this sentiment were repeated twice by the trial court immediately prior to the closing arguments in the case and once immediately after the closing arguments as the court was instructing the jury on the applicable law. Further, during the closing arguments, themselves, objections by trial counsel that an attorney was misstating the evidence or the law were routinely denied by the trial court with an admonition similar to the following: "I have previously stated the rules by which you may consider the statements made by either or any counsel during argument, that you will consider all remarks of counsel in light of those principles." Under these circumstances, we simply cannot find a reasonable likelihood that the jury credited a isolated comment by the prosecutor over the repeated statements of the trial court with respect to the law and the proper deliberative process. Thus, the trial court's decision not to grant a new trial on this ground cannot be deemed an abuse of discretion.[15]

## V. DISPOSITION

Bennett and Smith's convictions are affirmed, but Bennett's case is remanded for the trial court to exercise its discretion with respect to possible resentencing.

---

[15] Smith's trial counsel did not object to the specific statements here challenged, and the Attorney General argues that Smith has thereby forfeited this issue. (See *Tully*, *supra*, at p. 1010 [" 'a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury' "].) Smith, in contrast, avers that no forfeiture occurred because any further objections during argument would have been futile. While the record seems to indicate that the trial court was willing to remind the jury of its responsibilities in this context whenever a concern was brought to its attention, given our conclusion that no prejudicial error occurred, we need not reach the Attorney General's forfeiture claim.

Reardon, J.*

We concur:

_____
Streeter, Acting P.J.

_____
Tucher, J.

_____
* Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A141594, *People v. Smith* / A142094, *People v. Bennett*

**STREETER, ACTING P.J., CONCURRING**

I join in the panel's opinion but write separately to express a slightly different take on the trial court's observation that the prosecutor's having passed on opportunities to strike a same-race juror and a same-race alternate juror constitutes "powerful evidence" supporting the credibility of his proffered reasons at step three of the *Batson*/*Wheeler* [16] analysis.

**I.**

At the third step of *Batson*/*Wheeler*, the focus is on whether the trial court finds the prosecutor's race-neutral explanations to be credible with respect to the particular juror excused. As is the case with any inquiry into discriminatory treatment, the issue is context-sensitive, allowing a variety of circumstances to be taken into account. And among these circumstances is whether the prosecutor passed the panel—showing a willingness to accept its composition—with one or more same-race jurors included.

But attaching too much significance to the prosecutor's willingness to pass the panel with one or two same-race jurors serving on it "would provide an easy means of justifying a pattern of unlawful discrimination which stops only slightly short of total exclusion." (*People v. Snow* (1987) 44 Cal.3d 216, 225 (*Snow*).) Although the permissibility of taking into account the prosecutor's willingness to accept same-race jurors has often been repeated over the years (*ibid.*; see *People v. Turner* (1994) 8 Cal.4th 137, 168, disapproved on another point in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1170–1171; *People v. Blacksher* (2011) 52 Cal.4th 769, 802 (*Blacksher*); *People v. Jones* (2011) 51 Cal.4th 346, 362; *People v. Lenix* (2008) 44 Cal.4th 602, 629 (*Lenix*); *People v. Kelly* (2007) 42 Cal.4th 763, 780 (*Kelly*); *People v. Cornwell* (2005) 37 Cal.4th 50, 70 (*Cornwell*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22), this cautionary language

---

[16] See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162, 165.

1

from *Snow* warrants emphasis. It is not just a stray side comment. The *Snow* court discusses the issue at some length, at one point expressly overruling a case that was apparently based on the premise that "if the jury panel contains at least a minimum number of members of the cognizable group to provide defendant a representative cross-section of the community, he cannot complain of the prosecutor's pattern of unlawful discrimination in the use of his peremptory challenges." (*Snow*, *supra*, 44 Cal.3d at p. 225 [disapproving *People v. Davis* (1987) 189 Cal.App.3d 1177, 1190–1191].)

## II.

Stepping back and starting from first principles in this area, I note that, historically, the vice here was systematic exclusion of women and African Americans from jury service. (See *Taylor v. Louisiana* (1975) 419 U.S. 522 [exclusion of women]; *Glasser v. United States* (1942) 315 U.S. 60 [same], superseded on other grounds as stated in *Bourjaily v. United States* (1987) 483 U.S. 171, 181; *Peters v. Kiff* (1972) 407 U.S. 493 [exclusion of African Americans]; cf. *Smith v. Texas* (1940) 311 U.S. 128 [exclusion of African Americans from grand jury service].)

Adapting these systematic exclusion cases to the issue of discriminatory use of peremptory challenges, our Supreme Court, in *Wheeler, supra*, 22 Cal.3d 258, addressed a situation where the prosecutor struck every single one of the African Americans on the venire in that case. (*Id.* at pp. 262–265.) Because sweeping African Americans from the jury pool was based on a belief in "group bias," the Court found a violation of the defendant's right to an impartial jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Id*. at pp. 276–278.)

Although the precise doctrinal basis of *Wheeler* is no longer much discussed, *Wheeler*'s familiar three-step framework of analysis to detect discriminatory use of peremptory challenges remains vital under current law, having been embraced and effectively merged with the holding in *Batson, supra*, 476 U.S. at pages 94–98. But there remains a significant difference between *Wheeler* and *Batson*. *Batson*, like *Wheeler*, was a case in which the prosecutor used his strikes to sweep all African

Americans from a petit jury. (*Id*. at. p. 83.) While adopting the same three-step approach to analysis that *Wheeler* did, the high court held that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." (*Id*. at p. 86.)

Today, in practice, there is no recognized difference between *Wheeler* and *Batson*—hence the commonly used label *Batson/Wheeler*—but vestiges of *Wheeler*'s doctrinal foundation remain in some of the *Batson/Wheeler* case law. I think the undue weight the trial court in this case attached to the prosecutor's acceptance of two same-race jurors illustrates that. The whole point of *Wheeler* was to root out systematic exclusion of members of protected groups. Thus, under *Wheeler*, it was an effective rebuttal to show that while the prosecutor may have engaged in some discrimination, the discrimination was *not systematic enough* to violate article 1, section 16 of the California Constitution.[17]

Not so any more. Things changed in the years following *Batson*, as shown most clearly in *Snyder v. Louisiana* (2008) 552 U.S. 472 (*Snyder*), where the high court made clear that the Constitution forbids striking even a single prospective juror for a discriminatory purpose. (*Id*. at p. 478.) Under the now governing equal protection frame of analysis, the stages of proof are identical to those outlined in *Wheeler*, and indeed at step one, which tests for whether a prima facie case has been made out, the focus continues to be in part on whether the prosecutor's pattern of using strikes shows systematic exclusion of a protected group. (See *Batson*, *supra*, 476 U.S. at pp. 96–97.) But once a prima facie case is made out and the prosecutor has been required to proffer race-neutral reasons at step two, the focus shifts to whether discriminatory intent has been

---

[17] That is why most of the post-*Batson* cases citing *Snow* are not step three cases, where the issue is the prosecutor's intent in excusing a particular juror, but step one cases, where the issue is whether the pattern of strikes is sufficient to make out a prima facie case. (See *Turner*, *supra*, 8 Cal.4th at p. 168; *Kelly*, *supra*, 42 Cal.4th at p. 780; *Blacksher*, *supra*, 52 Cal.4th at p. 802; *Cornwell*, *supra*, 37 Cal.4th at p. 70.)

shown in striking a particular juror, after taking all relevant circumstances into account. (See *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–340, 342–347.)

Our Supreme Court follows the same three-step mode of analysis, ending at step three with its individualized focus on discriminatory intent. (*People v. Williams* (2013) 56 Cal.4th 630, 649; *Jones, supra*, 51 Cal.4th at pp. 363–369; *Lenix, supra*, 44 Cal.4th at pp. 613, 628–631.) Systematic exclusion remains highly relevant at step one, but at step three the peremptory excusal of even a single prospective juror violates *Batson/Wheeler* in California just as it does throughout the country under *Snyder*. The net result is that we now have, in effect, a "zero-tolerance" policy when it comes to discriminatory use of peremptory challenges under state and federal law.

### III.

Applying the California Supreme Court's *Batson/Wheeler* step three cases on this record, it is certainly not correct to say, as the trial court did here, that the prosecutor's acceptance or willingness to accept a same-race juror and a same-race alternate was "powerful" evidence rebutting the prima facie case of discrimination the trial court recognized had been established. At *Batson/Wheeler* step three, the issue was whether the prosecutor's proffered reasons for excusing David L., Pierre M., and Domanique J.— in each case, focusing on those particular jurors—were pretextual, not whether his decision to pass on some other juror was free of discrimination. Certainly, the prosecutor's acceptance of two others may have been indicative of good faith, but good faith in and of itself was not the issue. Many perpetrators of discrimination are sincere.

Psychological science on what is known as "moral credentials" and "moral licensing" in the field of implicit bias tells us that, sometimes, discrimination is masked by a discriminator's attempt to demonstrate lack of prejudice on a prior occasion. (Quintanilla & Kaiser, *The Same-Actor Inference of Nondiscrimination: Moral Credentialing and the Psychological and Legal Licensing of Bias* (2016) 104 Cal. L.Rev. 1, 9–10.) Anticipating the need to apply concepts of implicit bias to the discriminatory use of peremptory challenges, Justice Marshall, concurring in *Batson*, said that "outright prevarication by prosecutors [is not] the only danger here. '[I]t is even possible that an

attorney may lie to himself in an effort to convince himself that his motives are legal.' [Citation.]  A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically.  A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported. . . . [Sometimes] prosecutors' peremptories are based on their 'seat-of-the-pants instincts' as to how particular jurors will vote. . . . Yet 'seat-of-the-pants instincts' may often be just another term for racial prejudice." (*Batson*, *supra*, 476 U.S. at p. 106 (conc. opn. of Marshall, J.).)

Streeter, Acting P.J.

I concur:

_____
Tucher, J.

Filed 3/1/19

## CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ANDRE SMITH,<br><br>     Defendant and Appellant. | A141594<br><br>(Alameda County<br>Super. Ct. No. C172416B) |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JABRIE BENNETT,<br><br>     Defendant and Appellant. | A142094<br><br> (Alameda County<br>Super. Ct. No. C172416A)<br><br>**ORDER MODIFYING OPINION; FOR PARTIAL PUBLICATION; AND DENYING REQUEST FOR REHEARING [NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed February 7, 2019, be modified as follows:

1.     The opinion in the above matter was not certified for publication in the Official Reports when filed on February 7, 2019. For good cause it now appears that the opinion, as modified herein, but with the exception of parts III. and IV., shall be included in the Official Reports and it is so ordered.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. and IV.

A141594, *People v. Smith* / A142094, *People v. Bennett*

2.    The first paragraph of the opinion is hereby deleted and replaced with the following:

This criminal prosecution is the result of multiple charges brought against two co-defendants—Jabrie Bennett and Andre Smith[18] (collectively, appellants)—in connection with a January 2013 altercation, between two groups of teenagers outside of the Bayfair BART station in San Leandro, which escalated to the point where shots were fired and Kenneth Seets, an innocent bystander, was killed. Bennett was additionally prosecuted for the attempted murder of Donnell Jordan, based on an unrelated incident that occurred two days prior to the BART shooting and involved the same gun. In the published portion of our opinion, we address and reject appellants' assertion that the prosecutor improperly used three of his peremptory challenges to excuse potential jurors because they were Black, in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). In the unpublished portion of our opinion, we agree with Bennett that the trial court should reconsider his sentence in light of recent amendments to Penal Code section 12022.53,[19] and otherwise reject appellants' numerous other contentions.

3.    The petition for rehearing filed by appellant Jabrie Bennett on February 20, 2019, and joined in by appellant Andre Smith by notice filed February 22, 2019, is hereby DENIED.

The modifications and orders contained herein effect no change in the judgment.

Dated: _____._____                _____
                                                                               STREETER, ACTING P.J.

_____

[18] After their introduction, we generally refer to the individuals involved in these proceedings by their last names. However, individuals with the last name Smith—other than co-defendant Smith—will be referred to by their first names for purposes of clarity.

[19] All statutory references are to the Penal Code unless otherwise specified.

A141594, *People v. Smith / A142094, People v. Bennett*

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Jeffrey W. Horner |
| Counsel for Respondents: | Xavier Becerra, Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Donna M. Provenzano, Supervising Deputy Attorney General; David H. Rose, Deputy Attorney General |
| Counsel for Appellants: | Juliana Drous (Smith); Stephen B. Bedrick, by Court-Appointment under the First District Appellate Assisted Case System (Bennett) |

A141594, *People v. Smith* / A142094, *People v. Bennett*